The next case today is Jeffrey G. Carswell et al. v. E. Pihl & Sons et al. Appeal number 19-1630. Attorney Anderson, please go ahead and introduce yourself for the record, and then proceed with your argument. Good afternoon. Dean Anderson for the Petitioners. Might I request reservation of three minutes for rebuttal? No, you may have two. You only have ten minutes. Okay, thank you, Your Honor. In this case, it's quite clear, if you look at all of the scientific evidence in the case, that statistical evidence alone cannot rebut the presumption of causation in the particular circumstances of this case, especially in light of the fact that there's a consensus amongst the parties that only clinical testing will resolve the issue in question, and also because of the nature of the Petitioner's exposure. This was chronic exposure over a 30-year period to internal persistent radiation. And the science in this matter, which is actually contained in the appendix study of Van Hippel, and it's a study concerning the dangers of plutonium dispersal from nuclear warhead accidents, which is exactly relevant to this case, he takes the position for his model, he takes the situation where Seattle is the cloud of plutonium over Seattle, as in the Kula case, and he estimates what the effect would be on the inhabitants below. Due to the high population of Seattle, he predicts that there will be thousands of cancer deaths as a result of that. That's due to inhalation and ingestion of weapons of great plutonium. However, what he says, and I'll give you the reference to it, it's Appendix 230 of the appendix, he says that the long-term cancer death would not be statistically detectable, because when these people actually die 20 or 30 years later, their deaths, their cancer deaths are merged into the general regional amount of cancer deaths. So you can't really extract them. The only way you can determine in that particular case whether their deaths 20 or 30 years later are due to inhalation of plutonium is by clinical testing. Now, Dr. Metzler provides statistical evidence to the contrary. He says that he relies on what's called acute radiation within the atomic bombing of Nagasaki and Hiroshima, and also in x-ray accidents. Now, the relevant point here is that these two particular situations are examples of prompt acute radiation, which only lasts for a second or two seconds. When there's an accident using x-ray exposure, it's only within a fraction of a second. In the case of Hiroshima and Nagasaki, the exposure to the inhabitants there was only for two or three seconds, and that was it. In fact, Dr. Metzler states in his evidence that there was no fallout, virtually no fallout, because things like a plutonium cloud did not descend on Hiroshima and Nagasaki because of the high level at which the bomb was detonated. He said, because of that, most of the fallout went up into the upper atmosphere and dissipated. So in Hiroshima, Nagasaki, and the x-ray studies, we're dealing here only with a very short, acute exposure to radiation. Now, in these circumstances, quite clearly, the other way to determine whether or not the radiation, the exposure, and the cancers of the petitioners are, in fact, linked back to their work. You have four minutes remaining. Please proceed. That was the reason why, in the Kaneshiro case, Dr. Metzler's evidence there was eventually discounted in favor of clinical testing, which was later produced. Now, I want to refer briefly also to the director's involvement in this case, his intervention as a party litigant in opposition. The court has to look at this from the point of view of the U.S. Supreme Court case of Berger versus the United States, where there was a similar situation where the federal attorney actually intervened, and he gave the impression that he was a party litigant in the matter. The U.S. Supreme Court set aside the conviction irrespective of the evidence. In this case, it's even worse. The director here said, I am a party litigant, and I can do all this. But that's in violation totally of his duties under the Longshore Act, number one, to timelessly arrange for IMEs. A more difficult problem here is that he also has to arrange for or facilitate compromised settlements. In this case, what does he do when eventually the employer goes bankrupt? He doesn't have an opportunity to have a compromised settlement. On the contrary, he secretly contacts the Danish trustees and bankruptcies and threatens them with a $200 opposing petition of action. That's totally outrageous and totally illegal, total violation of his statutory duties under the Longshore Act. In addition, he totally ignores the Supreme Court's unanimous decision in the matter of Harcum. That's the Newport News case. There, they said unanimously on their interpretation of the Longshore Act, the director has no standing whatsoever, either before the Minister of Law Judge or before the Benefits Review Board. Also, he does not have standing either in relation to any of his statutory duties. And they list all his statutory duties, including the protection of special funds. So in both of these cases, he was acting totally illegally. And the result is, as it should be, in the Berger case, the court has to completely set aside the proceedings of the nullity. We should refer the matter back for a minute for an assessment of the actual wage laws, and the director should be ordered to pay for it due to his totally illegal conduct in this matter. If there are any particular questions on any other aspects of this case, which is very voluminous and very technical, I would welcome them at this point in time. We also have the issue, and I intend to go into it, of timeliness. And that, of course, is controlled by this court's own decision in the Bath Iron Company case versus the director of workers' compensation. In that case, the court stated quite clearly that the clock, the two-year statute of limitations period does not run simply because a petitioner or person knows that other workers suffer from the same condition, or even that other workers sued for the same condition. Then the court quite clearly said in those situations, complex medical issues, scientific issues, the clock only starts running when the expert information is given to the claimant. In this case, the claimant... Counsel, I want to ask you a question on the statute of limitations. I mean, the records suggest that two of your clients were actively involved in organizations that were very much focused on this airplane disaster, the radiation caused by it, and the effect that it had on individuals who were involved in dealing with it. And those involvements went back, I think in Mr. Carswell's case, perhaps back well before he filed his claim in this case, and the same with the other individuals. So how do you respond to that? I mean, there seems to be considerable evidence in the record that they were aware of the way in which they had been affected by this event, so that given that knowledge, they could fairly be held to having filed their claims much earlier in time than they did. How do you respond to that? Oh, quite simply, Judge Lopez, the claimant had no actual knowledge of the actual form of radiation they were exposed to. That only occurred in 2008 in the Barnaby report, which is put in the record, and also Dr. Roberts' medical examinations. Now, the actual litigation by Carswell, for example, in the European Parliament, that was due diligence by him to find out exactly what kind of radiation he was exposed to and what degree of radiation he was exposed to. Time has expired. Finish your answer in one sentence, please. In one sentence, well, quite clearly, you cannot compare, for example, Coffwood Hanson's case, you cannot compare the petitioner's actions in this case with regard to knowledge, because you have a carpenter, a freight handler, and a fireman with a similar experience by a Danish expert scientist on radiation. Okay, thank you very much, counsel. You have reserved some time. We'll hear from your opponents. Your Honor. Attorney Anderson, please mute your video and your cell phone, please. And at this time, when Attorney Boyle, please unmute, and you have five minutes of allotted time, and introduce yourself on the record, and you may begin. Good afternoon, Your Honors. Matthew Boyle on behalf of the Director, Officer of Workers' Compensation Programs. Your Honors, the ALJ denied these claims because she found, based on expert testimony, that the ailments alleged by the claimants, kidney cancer, stomach cancer, baritosophagus, hypothyroidism, are not caused by exposure to plutonium radiation, and therefore did not stem from the claimant's employment at Thule Air Base at the time of the crash. The question before you is whether there's substantial evidence to support that finding, and there clearly is. The claimants just want you to credit different evidence than the ALJ did. The bulk of the evidence the ALJ relied on came from the expert testimony of three physicians, Dr. Mettler, who is an internationally recognized expert on the effects of radiation on the human body, and Drs. Turnbull and Russo, both of whom are cancer surgeons at the Memorial Sloan Kettering Cancer Center, who specialize respectively in cancers of the upper digestive tract and stomach and kidney cancer. And the ALJ found that the evidence they presented was overwhelming for lack of causation. I'll give you some examples of what this expert said. Dr. Mettler testified that, quote, radiation doesn't cause some kinds of cancers, and we know plutonium has never been shown to cause kidney or stomach cancer. He said that held true in animal studies and even in the most highly exposed human populations from Mayak, Russia. He also said, quote, regardless of the level of plutonium exposure, when you look at epidemiology, there is no statistically significant excess of either kidney cancer or stomach cancer from plutonium. It just isn't there. As to hypothyroidism, he said it was absolutely not related to plutonium radiation exposure and that plutonium exposed populations have never shown an increase in hypothyroidism. And the experts explained why plutonium radiation does not cause these conditions. As to the stomach, Drs. Mettler and Turnbull both testified that plutonium doesn't affect the stomach because the stomach lining is renewed in such a short period of time, which is only about seven days. Dr. Turnbull testified that we know what causes varicose esophagus and stomach cancer. They're caused respectively by acid reflux or H. pylori infection, and that ionizing radiation is absolutely not a factor in either condition. As to the kidneys, Dr. Mettler testified that the dose of plutonium radiation required to affect the kidneys would result in a much higher dose to the lungs, which would, in fact, be fatal. He and Dr. Russo both also testified that smoking and obesity are greater risk factors for kidney cancer than is radiation and noted that Mr. Erickson was both a smoker and obese and had the additional risk factor of coronary artery disease. As to hypothyroidism, Dr. Mettler testified that, as with the kidneys, dose that would take to shut down the thyroid would result in a fatal dose of radiation to the lungs. But simply, Your Honors, what this evidence shows is that plutonium radiation doesn't affect the upper digestive tract or the stomach, and that a person exposed to enough plutonium radiation to cause kidney cancer or hypothyroidism would never have lived long enough to get either of those diseases. The ALJ found that this evidence was bolstered by Dr. Jewell's epidemiological study, which compared the workers who were involved in the cleanup at Thule to workers who worked there either before the cleanup started or after the cleanup ended. In that study, the cleanup group showed no excess of cancers, no increase in hospital admissions, and no increased mortality. All of this evidence, Your Honors, is more than sufficient to meet the substantial evidence standard, so we respectfully request that you affirm the decisions of the ALJ and the board. Does the group have any questions for me? No, thank you. Thank you, Your Honors. At this time, Mr. Boyle may mute his audio device and video, and if Attorney Beiser would please unmute, and you have five minutes, please introduce yourself for the record and proceed. Sarah Beiser on behalf of Respondent E. Peel in Bankruptcy. Good morning, Your Honors. Mr. Boyle has actually covered very thoroughly many of the points that I wanted to raise. I want to stress something I know that you're very familiar with, that the standard is, of course, substantial evidence, and we are required to accept the ALJ's decision and her findings and inferences unless they are irrational. And as Mr. Boyle pointed out, they were exactly the opposite of irrational. The evidence was actually overwhelming, as put forth by Dr. Mettler, by Dr. Ansbaugh, by Dr. Knudgell, who had studied this population for most of his professional career. I'd like to point out that the HIPAA article that my friend and colleague, Mr. Anderson, refers to actually does not refer to kidney or stomach cancers at all, and Dr. Mettler was very, very clear in his report and in his testimony that his discussion was with regard to stomach cancers and kidney cancers. He did not say the plutonium cannot impact or be relevant to other cancers, but the issues in this case are stomach cancers and kidney cancers, and there is no evidence, frankly, from any nuclear accident that plutonium causes any increase whatsoever in the incidence of stomach or kidney cancers. So, back with regard to the standard of substantial evidence, Dr. Mettler provided more than enough evidence to support the substantial evidence standard that this court must adhere to. And, Your Honors, unless you have any questions for me, I will rest. Thank you. Thank you, Attorney Beiser. If you could please mute your audio and video at this time. You can unmute your video and your cell phone and proceed. We can see you, sir. Can you hear me? Yes. Okay. Very briefly, on the first issue which Judge Lippisch raised concerning timeliness and these actions, these actions were not for compensation. European Court action was to obtain information. They didn't know what the standard levels of radiation were at all. There was another action prior to that by another attorney, and that also was not for radiation. That was to get an government to set up a compensation board for the investigation and possible compensation to be paid out. But these were not compensation acts. They were not tort actions of that nature. Now, with regard to Dr. Turnbull-Risseau, these two surgeons, highly qualified, they have absolutely no knowledge or experience in radiation matters. In fact, Turnbull-Risseau, the first question he was asked by his counsel, do you have an opinion on the cause of causal radiation? And he says, no, I don't, because I don't know enough about it. Causal records were destroyed years ago by the Melbourne Hospital, which conducted his stomach and esophageal surgery. Now, with regard to stomach cancer and the von Lippel report, the von Lippel report states quite clearly that there is no statistical way to detect the subsequent cancers in the population of an exposed person over 20, 30 years when they eventually die. That being given, there is no reservoir of statistical evidence in this particular case of chronic exposure, which anyone can draw a statistical assessment for the excess risk of stomach or kidney cancer. So the employer relied entirely on evidence from Dr. Mexler of prompt exposure to radiation over a period of a second, acute exposure over a period of a second or so. If you take that low level of radiation, which he had worked on... Time has expired. Thank you very much, Mr. Anderson. Your time is up. That concludes the argument for today. The session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this Honorable Court. Counsel, you should disconnect from the meeting at this time.